UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
02 DEC 23 PM 2:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| DOUGLAS "DARK HORNS" BAILEY, | ) | Civil Action No. CV 01-S-2843-NE |
| Plaintiff, | ) | |
| BILLY "TWO FEATHERS" JONES, | ) | Civil Action No. CV 01-S-2921-NE |
| Plaintiff, | ) | |
| MARK "BIG HORSE" RIENDIEU, | ) | Civil Action No. CV 01-S-2922-NE |
| Plaintiff, | ) | |
| JOHN MICHAEL SOUTH, | ) | Civil Action No. CV 01-S-2924-NE |
| Plaintiff, | ) | |
| FRANKIE MARK VALENTINE, | ) | Civil Action No. CV 01-S-2926-NE |
| Plaintiff, | ) | |
| MELVIN "SUN BEAR" DUNAWAY, | ) | Civil Action No. CV 01-S-2928-NE |
| Plaintiff, | ) | |
| JAMES "THUNDERING HEART" RAINES, | ) | Civil Action No. CV 01-S-2929-NE |
| Plaintiff, | ) | |
| VIRGIL L. DAMRON, | ) | Civil Action No. CV 01-S-2933-NE |
| Plaintiff, | ) | |
| RICHARD "WHITE WOLF" MINGOS, | ) | Civil Action No. CV 01-S-2937-NE |
| Plaintiff, | ) | |
| ELMER "LITTLE CRICKET" TAYLOR, | ) | Civil Action No. CV 01-S-3024-NE |
| Plaintiff, | ) | |

ENTERED
DEC 23 2002

23

| | |
|---|---|
| JAMES "BLACK OTTER" GAY, ) | Civil Action No. CV 01-S-2941-NE |
| ) | |
| Plaintiff, ) | |
| ) | |
| CHARLES WAYNE "NIGHT OWL" MILLER, ) | Civil Action No. CV 02-S-0384-NE |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| WARDEN BILLY MITCHEM; DEPUTY ) | |
| WARDEN DAVID WISE; OFFICER DARYL ) | |
| DeGRAFFENRIED; OFFICER MICHELLE ) | |
| PETTAY; OFFICER STEPHEN CHENAULT; ) | |
| and OFFICER ARTHUR EDWARDS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

The twelve plaintiffs in these consolidated *pro se* actions are inmates of the Alabama prison system.[1] All were incarcerated in the Limestone Correctional Facility on the date the original action was commenced pursuant to 42 U.S.C. § 1983.[2] The defendants — *i.e.*, Warden Billy Mitchem, Deputy Warden David Wise, Sergeant Daryl DeGraffenried, Sergeant Michelle Pettay, Officer Stephen Chenault, and Officer Arthur Edwards[3] — are employed by the Alabama Department of Corrections, and were assigned to the Limestone Correctional Facility on the date of the incident forming the basis of plaintiffs' claims.

---

[1] The plaintiffs are Douglas "Dark Horns" Bailey, Frankie Mark Valentine, Billy "Two Feathers" Jones, Mark "Big Horse" Riendieu, John Michael South, Melvin "Sun Bear" Dunaway, James "Thundering Heart" Raines, Virgil L. Damron, Richard "White Wolf" Mingos, Elmer "Little Cricket" Taylor, James "Black Otter" Gay, and Charles Wayne "Night Owl" Miller.

[2] The claims addressed in these consolidated actions originally were asserted on behalf of sixteen named plaintiffs, identifying themselves as the Native American Prisoners of North Alabama, "Turtle Wind Clan." Pursuant to this court's standard procedures and practice since the adoption of the Prison Litigation Reform Act of 1996 (PLRA), the plaintiffs were directed to file separate, individual actions, to ensure that each plaintiff would be required to meet the filing fee and screening provisions of the PLRA. *See* 28 U.S.C. §§ 1915(e), 1915A, and 42 U.S.C. § 1997e.

[3] The court has corrected the spelling of defendants' names based on information provided in defendants' Special Report.

Plaintiffs allege that their First Amendment right to freely exercise religious beliefs was infringed when defendants entered a fenced area set aside at the Limestone Correctional Facility for worship by inmates professing to be adherents to Native American religions. During a "shakedown search" of the area, various sacred items were damaged, including the medicine (or spirit) wheel, the fire pit, and an altar. As compensation for the alleged constitutional violation, plaintiffs seek a tool box and materials to construct new ceremonial items, a shed with electricity, and $15,000 in monetary damages ($2,500 from each defendant).

In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(2), the complaint and amended complaints were referred to a magistrate judge for a preliminary report and recommendation. *Cf. McCarthy v. Bronson*, 500 U.S. 136, 111 S. Ct. 1737, 114 L. Ed. 2d 194 (1991). The magistrate judge entered an order directing that copies of the complaints be forwarded to each defendant, and that defendants thereafter file a special report addressing plaintiffs' factual allegations. Defendants were advised that the special report could be submitted under oath or accompanied by affidavits.[4]

Defendants filed a special report in each case, accompanied by a copy of an institutional incident report dated November 2, 2001, and the affidavits of Billy Mitchem, David Wise, Daryl DeGraffenried, Michelle Pettay, Stephen Chenault, Arthur Edwards, Troy Hughes, and Diane Sisk. On September 10, 2002, after reviewing defendants' submissions, the court ordered the cases consolidated, and notified each plaintiff that defendants' special report would be considered as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. Each plaintiff also was informed that he was allowed twenty days to respond by filing counter-

---

[4] By the same Order, each plaintiff was advised that, after receiving a copy of defendants' special report, any who desired to rebut matters presented by defendants should file counter-affidavits.

affidavits or other materials.[5] All plaintiffs filed responses to defendants' motion for summary judgment, to which each attached his personal affidavit, as well as copies of: affidavits of fellow inmates; an Alabama Department of Corrections memorandum regarding religious practices within the Alabama prison system; and, documents from various lawsuits filed in the U.S. District Court for the Middle District of Alabama.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

The parties moving for summary judgment bear the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact to be decided at trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving parties discharge this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the opposing parties' case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593

---

[5] Plaintiffs also were advised of the consequences of any default or failure to comply with Federal Rule of Civil Procedure 56. *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

(11th Cir. 1995) (*per curiam*). Rule 56 permits the movants to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553.

When the moving parties have discharged their burden, the opposing parties must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593. The non-moving parties must come forward with more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

When deciding whether the moving parties have met their burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-moving parties, and to resolve all reasonable doubts in favor of those parties. *See, e.g., Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993); *Four Parcels of Real Property*, 941 F.2d at 1437. Inferences in favor of the non-moving parties are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover, inferences that are "merely colorable,"[6] conclusory,[7] or conjectural, do not create a genuine issue of material fact. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). In short, to avoid summary judgment, the opposing parties must come forward with specific facts that are "material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences,

---

[6] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988).

[7] *See Johnson v. Fleet Finance, Inc.*, 4 F.3d 946, 949 (11th Cir. 1993); *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989).

conjectural, speculative, nor merely suspicious." *American Lease Plans, Inc. v. Silver Sand Co. of Leesburg, Inc.*, 637 F.2d 311, 315 (5th Cir. 1981).[8]

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and,if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)).

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S. Ct. at 2512.

Finally, unless the plaintiffs, who carry the ultimate burden of proving their case, are able to show some evidence with respect to each element of their claims, all other issues of fact become immaterial, and the moving parties are entitled to judgment as a matter of law. As the Eleventh Circuit has explained:

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d 1530, 1532 (11th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552).

With the foregoing standards in mind, the following facts are not disputed or, if disputed, presented in a light most favorable to plaintiffs, the non-moving parties.

## FACTS

Officer Steven Chenault was working as the Crossover Gate Officer at the Limestone Correctional Facility during the early morning hours of November 2, 2001, when he overheard two unidentified inmates talking about contraband hidden in the Native American ceremonial area. Specifically, he heard that a large "shank," or knife-like object, was buried in the ground of the ceremonial area. The ceremonial area, which is considered a sacred site by Native American inmates, is a fenced compound set aside for religious meetings of inmates professing a belief in Native American religions. The area is locked, and access to it must be obtained through a guard. Within the compound, inmates had constructed several religious icons, including a medicine (or spirit) wheel, a fire pit, and an earthen ("Mother Earth") altar. The medicine wheel was made of rocks arranged in a circle, with rock "spokes" joining in the center. In addition, various plants and herbs with religious significance to Native Americans (for example, blue corn, beans, sage, sweetgrass, and tobacco) were cultivated in the area.

Officer Chenault notified Sergeant DeGraffenried of the remarks he overheard, and was instructed to immediately conduct a thorough search. Officer Chenault, accompanied by Officer Edwards and Native American inmates Billy Jones and John South, entered the ceremonial grounds around 3:00 a.m. Officers Chenault and Edwards placed a piece of cardboard on the ground and instructed inmates South and Jones to place all items housed in the storage cabinet on the cardboard, and to explain the use of each item as it was removed. The inmates then were directed to lift the storage cabinet. Officer Edwards found two broom handles that had been sharpened to a point underneath the cabinet and confiscated them. The inmates replaced items in the storage cabinet and the officers and inmates left the area together. The officers secured the gate when exiting. It is at this point that plaintiffs' version of the incident diverges from that of defendants.

Plaintiffs submit the affidavits of several inmates to prove that Officers Chenault and Edwards returned to the sacred ground after inmates Jones and South departed, and began to dig with shovels, hoes, and picks. In doing so, they damaged religious icons, moved the rocks of the medicine wheel, filled in the fire pit, and leveled the altar.[9]

## DISCUSSION

Although not clearly stated, the court interprets plaintiffs' complaints to allege that defendants interfered with plaintiffs' First Amendment right to freely practice their religion by using

---

[9] According to one account, the officers "performed the shakedown by digging up the sacred fire pit, our earth mound alter, the pipe stands, and the medicine wheels" with "shoves [sic], rakes, and hoes leaving sacred objects scattered to the four directions, desecrated, and totaly [sic] destroyed, unuseable period for any native ceremony." (Amended complaint of Frankie Mark Valentine, at 4.) The court notes that defendants deny any such destruction. Defendants assert that they left the sacred area with inmates Jones and South and did not return. For purposes of summary judgment, however, the court must view the evidence in the light most favorable to plaintiffs.

shovels, hoes, and rakes when conducting a search of the Native American ceremonial grounds for weapons, thereby destroying religious icons and desecrating the sacred ground.[10]

The Supreme Court has said that the First Amendment's prohibitions against laws "prohibiting the free exercise" of religion[11] "embrace[] two concepts, freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Cantwell v. State of Connecticut*, 310 U.S. 296, 303-04, 60 S. Ct. 900, 903, 84 L. Ed. 1213 (1940); *see also United States v. Ballard*, 322 U.S. 78, 86, 64 S. Ct. 882, 886, 88 L. Ed. 1148 (1944); *Sharp v. Sigler*, 408 F.2d 966, 970 (8th Cir.1969). Stated differently, the "freedom to act" is conditional and relative; consequently, federal and state governments may prescribe and enforce reasonable conditions to control conduct which may be contrary to a person's religious beliefs in the interest of the public welfare and protection of society. For example, when denying Mormons an exemption from the criminal sanctions attendant to plural marriages, the Supreme Court said:

> Laws are made for the government of *actions*, and while they cannot interfere with mere religious beliefs and opinions, *they may with practices* . . . . Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government would exist only in name under such circumstances.

*Reynolds v. United States*, 98 U.S. 145, 166-67, 25 L. Ed. 244 (1878) (emphasis supplied).

---

[10] Certainly, plaintiffs can claim no ownership rights in either the sacred ground itself, or the religious icons constructed therein, that would support a due process claim, nor can they allege an Eighth Amendment violation.

[11] The First Amendment to the United States Constitution provides that:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for redress of grievances.

U.S. Const., amend. I. The amendment was made applicable to the states by the Fourteenth Amendment to the United States Constitution.

Prisoners enjoy the First Amendment's proscription of laws infringing upon their ability freely to practice religious beliefs; even so, due to both the reality of incarceration and the inherent conflict with legitimate penological objectives, the constitutional protections accorded inmates are considerably more circumscribed than those of the public generally. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987); *Powell v. Estelle*, 959 F.2d 22, 23 (5th Cir. 1992). "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S. Ct. 1049, 1060, 92 L. Ed. 1356 (1948). Those "limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives — including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone*, 482 U.S. at 348, 107 S. Ct. at 2404 (citations omitted). In other words, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804, 41 L. Ed. 2d 495 (1974).

Although plaintiffs go into great detail about who ordered the search, the early morning hours during which it occurred, who was present, the tools used to search the area, and the damage that resulted, the admissible evidence on these points falls short of establishing any link to several defendants.[12] There is no evidence, for example, disputing Warden Mitchem's affidavit testimony

---

[12] The court notes that only two of the plaintiffs claim that they were present for the search, and that all of the complaints about the actions of defendants filed by the remaining plaintiffs are based on hearsay. When considering a motion for summary judgment, "a court may only consider evidence that is admissible or that could be presented in admissible form" at trial. *Denney v. City of Albany*, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) (citing *Prichard v. Southern Company Services*, 92 F.3d 1130, 1135 (11th Cir. 1996) (holding that a plaintiff "cannot use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial") (in turn citing *McMillian v. Johnson*, 88 F.3d 1573, 1583-84 (11th Cir. 1996) (same)). Ordinarily, a claimant's "testimony recounting what [another person] allegedly told [him] does not raise a genuine fact issue because it is hearsay." *Churchill Business Credit, Inc. v. Pacific Mutual Door Co.*, 49 F.3d 1334, 1337 (8th Cir.1995); *see also Firemen's Fund Insurance Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir.1993) ("Inadmissible hearsay evidence alone may not defeat a summary judgment

that he did not order the search, and that he was not aware that it had occurred until afterward. Likewise, there is no evidence that Deputy Warden Wise was involved, or that Sergeant Pettay supervised it. Plaintiffs simply are attempting to implicate these defendants through the concept of *respondeat superior*. However, "[t]here is no *respondeat superior* liability under § 1983." *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir. 1995) (citing *Monell v. Department of Social Services*, 436 U.S. 658, 690-92, 98 S. Ct. 2036-37, 56 L. Ed. 2d 611 (1978), and *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993)). Supervisory personnel may be held accountable for the constitutional violations of their subordinates only upon proof that the supervisors: (1) were directly involved in the wrongdoing; (2) failed to remedy a wrong after learning of it through report or appeal; (3) created or allowed a policy under which the violation occurred; or (4) were grossly negligent in managing the subordinates who caused the wrongdoing. *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986). Absent some evidence indicating that Warden Mitchem, Deputy Warden Wise, or Sergeant Pettay participated in, knew of, sanctioned, or were otherwise affirmatively linked to the acts complained of by plaintiffs, the claims against those defendants are insufficient to state a claim under 42 U.S.C. § 1983. Because there is no genuine issue concerning these material facts, these three defendants are entitled to summary judgment.

---

motion").
    Even so, as the foregoing authorities indicate, hearsay testimony may be considered at the summary judgment stage if it could be presented in admissible form at trial. The Eleventh Circuit explained the standard of "evidence that may be reduced to admissible form at trial" in *Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999), saying:

> We believe that the courts have used the phrases "reduced to admissible evidence at trial" and "reduced to admissible form" to explain that the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose. For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).

*Id.*

The crucial issue, therefore, is whether the remaining defendants violated plaintiffs' constitutional rights when they entered and searched the Native American grounds on November 2, 2001. The court concludes that they did not, because their search was a reasonable and legitimate response to a report of a weapon buried in the ceremonial area.

Inmates are prohibited from having weapons of any description, regardless of how crude the weapon might be. Any suspicion that there might be a weapon anywhere within the confines of the prison requires immediate action and a search for the weapon, regardless of where the weapon may be concealed, or the time of day or night the report is received. Central to all other institutional concerns is the consideration of internal security. It is in the light of this legitimate institutional objective that a court must assess challenges to prison regulations based on the asserted constitutional rights of prisoners. *Pell v. Procunier*, 417 U.S. 817, 823, 94 S. Ct. 2800, 2804, 41 L. Ed. 2d 495 (1974). "Freedom of religion can never mean . . . freedom to flagrantly disregard reasonable rules of conduct in or out of prison." *Evans v. Ciccone*, 377 F.2d 4, 6 (8th Cir. 1967); *see also Sostre v. McGinnis*, 334 F.2d 906, 908 (2d Cir. 1964). The sacred grounds are not insulated from institutional security concerns, nor are they a sanctuary from reasonable and necessary measures to maintain security.

In keeping with their duty and authority to search for reported contraband, correctional officers entered the Native American grounds on November 2, 2001. Officers Chenault and Edwards were accompanied by two inmate members of the Native American religious group as they searched the area for reported weapons. The area they searched was within the confines of the Limestone Correctional Facility, and, state prisoners were allowed to use the area for religious services only with the express permission of the Alabama Department of Corrections. Within that

area the officers found two broom handles that had been sharpened to a point and concealed under a storage cabinet. Even though the officers deny damaging any items of religious significance, and aver that the inmates who accompanied them were the ones who handled everything, and that the area was in order when they departed, for purposes of defendants' motion for summary judgment the court assumes that the officers damaged religious icons, moved the rocks of the medicine wheel, filled in the fire pit, leveled the altar in the process of digging, and left the sacred grounds in disarray upon departure. Even making such assumptions, the search for a reportedly buried "shank" was essential to the security of the prison, and the fact that sacred objects were moved or even damaged during the search fails to state an actionable claim of constitutional proportions.

It also is important to observe what the evidence does *not* show. It does not show an illegitimate motive for the disruption of the sacred ground. There is no assertion, nor any evidence, that the actions taken on November 2, 2001 were in retaliation for the exercise of any constitutional right. There is no evidence that the search was discriminatorily targeted at Native American inmates. Rather, the evidence shows without dispute that the search and consequential damage to the sacred ceremonial ground was the direct result of officers receiving a report that weapons might be hidden there, indeed, *buried* there. The defendants' actions in searching the area for contraband did not unreasonably interfere with plaintiffs' right to practice their religion and, therefore, did not violate plaintiffs' constitutional rights.

Plaintiffs also complain about who was *not* present at the time of the search, however, and have attached a copy of a 1999 memorandum of the Alabama Department of Corrections concerning "Religious Beliefs and Practices for Committed Offenders." That document contains the following statements:

-13-

>   19. TRAINING OF CORRECTIONAL OFFICERS ON INSPECTIONS PROCEDURES: Department of Corrections officials shall be taught the proper procedures for inspecting and viewing all Native American items. Specifically, the Department of Corrections shall train its personnel not to touch the medicine bags or sacred pipes of the Native American inmates. Should an officer believe that it is necessary to inspect the contents of a Native American's medicine bag or sacred pipe, the officer shall bring the inmate to the chaplain's office where the contents of the bag or the pipe can be visually inspected. In the event that the chaplain is not present, the inspection may be performed in the presence of the shift commander.

An allegation that defendants failed to follow an agency rule or routine procedure does not elevate plaintiffs' claim to one of constitutional proportions. Even assuming the facts are as plaintiffs state them, and that neither the shift commander nor chaplain was present when officers conducted the search, plaintiffs still fail to state a claim. The mere fact that departmental rules, regulations, or procedures have been violated does not, alone, give rise to an issue of constitutional proportions. *See, e.g., United States v. Caceres*, 440 U.S. 741, 751-52, 99 S. Ct. 1465, 59 L. Ed. 2d 733 (1979); *Caruth v. Pinkney*, 683 F.2d 1044, 1052 (7th Cir. 1982); *Dowdy v. Johnson*, 510 F.Supp. 836, 838 (E.D. Va. 1981).

Likewise, plaintiffs cannot claim a constitutional violation based upon a theory that defendants violated state regulations. *See Colon v. Schneider*, 899 F.2d 660, 666-69 (7th Cir. 1990). Failure of state officials to fulfill their duties under state law does not give rise to a federal constitutional claim under 42 U.S.C. § 1983. *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (holding that a prison official's failure to follow the prison's own policies, procedures, and regulations does not constitute a violation of due process if constitutional minima are nevertheless met); *Brown v. Texas A & M University*, 804 F.2d 327, 335 (5th Cir. 1986) (holding that a state agency's violation of its internal regulations did not give rise to a constitutional claim). Thus,

plaintiffs' claim that defendants violated their constitutional rights when failing to follow prison regulations or procedures does not salvage this claim under § 1983.

## CONCLUSION

Consistent with the foregoing memorandum opinion, an appropriate order will be entered in each of these consolidated actions, dismissing each plaintiff's claims with prejudice.

DONE this **23rd** day of December, 2002.

_____
United States District Judge